Mod AO 442 (09/13) Arrest Warrant     AUSA Name & Telno: Matthew Laroche - 212-637-2420

# UNITED STATES DISTRICT COURT

for the

## Southern District of New York

MAR 2 0 2018

CLERK U.S. DISTRICT COURT
_____ VIRGINIA

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No.   18 Cr. |
| ALI SADR HASHEMI NEJAD | ) | |
| | ) | |
| | ) | **18 CRIM 224** |
| | ) | |
| _Defendant_ | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_     ALI SADR HASHEMI NEJAD
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☐ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to defraud the United States (18 U.S.C. § 371)
Conspiracy to violate the International Economic Powers Act (50 U.S.C. § 1705; 31 C.F.R. §§ 560.203, 560.204, 560.205)
Bank fraud (18 U.S.C. §§ 1344 and 2)
Conspiracy to commit bank fraud (18 U.S.C. § 1349)
Money laundering (18 U.S.C. § 1956)
Conspiracy to commit money laundering (1956(h))

S/Kevin Nathaniel Fox

Date:     03/19/2018

_____
_Issuing officer's signature_

City and state:     New York, New York

The Honorable Kevin N. Fox, U.S.M.J.
_Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ 03/19/2019 , and the person was arrested on _(date)_ 03/19/2018 at _(city and state)_ Dulles, Virginia . |
| Date: 03/20/2018 |

_____
_Arresting officer's signature_

Christopher Earley, Special Agent, FBI
_Printed name and title_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x
                                  :
UNITED STATES OF AMERICA          :       **SEALED INDICTMENT**

        - v. -                    :       18 Cr.

ALI SADR HASHEMI NEJAD,           :
                                          **18 CRIM  224**
                Defendant.        :

                                  .:
- - - - - - - - - - - - - - - - -x

## BACKGROUND

### The International Emergency Economic Powers Act

The Grand Jury charges:

1.    The International Emergency Economic Powers Act
("IEEPA"), codified at Title 50, United States Code, Sections
1701-1706, confers upon the President authority to deal with
unusual and extraordinary threats to the national security and
foreign policy of the United States.  Section 1705 provides, in
part, that "[i]t shall be unlawful for a person to violate,
attempt to violate, conspire to violate, or cause a violation of
any license, order, regulation, or prohibition issued under this
title."  50 U.S.C. § 1705(a).

2.    Beginning with Executive Order No. 12170, issued
on November 14, 1979, the President found that "the situation in
Iran constitutes an unusual and extraordinary threat to the
national security, foreign policy and economy of the United

States and declare[d] a national emergency to deal with that threat."

3.    On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

4.    The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services

2

to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC").

5.    The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.    31 C.F.R. § 560.203.

### The Venezuelan Housing Project and the Defendant

6. .  On or about August 31, 2004, the Governments of Venezuela and Iran entered into a Cooperation Framework Agreement, whereby they agreed to cooperate in certain areas of common interest.  On or about December 2, 2005, the Governments of Venezuela and Iran supplemented the Cooperation Framework Agreement by entering into a Memorandum of Understanding (the "MOU") regarding an infrastructure project in Venezuela (the "Project").  Together, those agreements, in substance and in part, called for cooperation between the Governments of Venezuela and Iran toward the construction of thousands of housing units in Venezuela by, for example, directing the parties to sign "commercial contracts" for the purpose of completing the Project.

7.    The Project was led by Stratus Group, an Iranian

3

conglomerate established in Tehran, Iran, in or about 1978 with
business operations in the construction, banking, and oil
industries. Among other entities, Stratus Group comprises
Stratus International Contracting Company, a Tehran-based
construction company, which has developed infrastructure
projects in Iran and elsewhere, including in Yemen, Pakistan,
and Djibouti, as well as the Eghtesad-e-Novin Bank ("EN Bank"),
which was the first private bank in Iran. At all times relevant
to this Indictment, Stratus Group was controlled and operated by
a co-conspirator not named as a defendant herein ("CC-1") and
CC-1's family, including CC-1's son, ALI SADR HASHEMI NEJAD, the
defendant.

8.    In or about December 2006, Stratus Group
incorporated a company in Tehran, which was then-known as the
Iranian International Housing Corporation ("IIHC"). IIHC was
responsible for construction for the Project. At all times
relevant to this Indictment, IIHC was owned and operated by the
Stratus Group.

9.    On or about July 2, 2007, IIHC entered into a
contract with a subsidiary (the "Subsidiary") of a Venezuelan
state-owned energy company (the "VE Company"), which called for
IIHC to build approximately 7,000 housing units in Venezuela in
exchange for approximately $475,734,000 U.S. dollars.

4

10.   In or about 2009, the Stratus Group created the Venezuela Project Executive Committee (the "Project Committee") to oversee the execution of the Project.  Its members included, among others, ALI SADR HASHEMI NEJAD, the defendant.  The defendant also had other roles in connection with the Project. For example, SADR was responsible for managing the Project finances.

11.   In or about 2010, ALI SADR HASHEMI NEJAD, the defendant, and CC-1 incorporated two entities outside Iran, using St. Kitts and Nevis passports and a Dubai, United Arab Emirates address, for the purpose of, *inter alia*, receiving U.S. dollar ("USD") payments related to the Project on behalf of IIHC:  (i) Clarity Trade and Finance ("Clarity"), which was incorporated in Switzerland on or about March 19, 2010, and (ii) Stratus International Contracting, J.S., a/k/a "Stratus Turkey," a/k/a "Straturk" ("Stratus Turkey"), which was incorporated in Turkey on or about October 20, 2010.  At all times relevant to this Indictment, Stratus Turkey and Clarity were owned and controlled by SADR and his family members.

12.   At all times relevant to this Indictment, ALI SADR HASHEMI NEJAD, the defendant, and others conspired to evade U.S. sanctions by conducting international financial transactions using Clarity and Stratus Turkey on behalf of and

for the benefit of Iranian individuals and entities, including themselves and IIHC, in order to conceal from U.S. banks and others that services were being provided to Iran in violation of the IEEPA and the ITSR.

13. Specifically, between in or about April 2011 and in or about November 2013, the VE Company, at the direction of ALI SADR HASHEMI NEJAD, the defendant, and others, made approximately fifteen payments to IIHC on behalf of the Subsidiary through Stratus Turkey or Clarity, totaling approximately $115,000,000 USD. As directed by the defendant, and others, the payments were routed from the VE Company through banks in the United States to Stratus Turkey or Clarity's bank accounts at a financial institution in Switzerland ("Swiss Bank-1"). Once the payments were received by Stratus Turkey and Clarity, the majority of the funds were transferred to another off-shore entity located in the British Virgin Islands which was incorporated by SADR and others, on or about February 2, 2009. Additionally, on or about February 1, 2012, Clarity wired more than $2,000,000 of proceeds from the Project directly into the United States. Those proceeds were then used to purchase real property in California.

6

## STATUTORY ALLEGATIONS

## COUNT ONE

### (Conspiracy to Defraud the United States)

The Grand Jury further charges:

14.   The allegations contained in paragraphs 1 through 13 of this Indictment are repeated and realleged as if fully set forth herein.

15.   From at least in or about 2006, up to and including at least in or about May 2014, in the Southern District of New York, Turkey, Switzerland, Iran, and elsewhere, ALI SADR HASHEMI NEJAD, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of OFAC in the enforcement of economic sanctions laws and regulations administered by that agency.

### Overt Acts

16.   In furtherance of the conspiracy and to effect the illegal object thereof, ALI SADR HASHEMI NEJAD, the defendant, and others committed the overt acts set forth below, among others:

7

a.    On or about February 2, 2009, CC-1 incorporated Stratus Global Investments Incorporated in St. Kitts and Nevis.

b.    On or about December 8, 2009, CC-1 incorporated Cirrus General Trading FZE ("Cirrus") in Dubai, United Arab Emirates.

c.    On or about February 10, 2010, IIHC nominated Cirrus to receive the proceeds of the Project on its behalf.

d.    On or about February 22, 2010, CC-1 registered Clarity Trade & Finance, S.A. in Switzerland and opened a temporary bank account in Clarity's name at a financial institution in Switzerland ("Swiss Bank-2").

e.    On or about March 19, 2010, SADR incorporated Clarity in Switzerland.

f.    On or about May 12, 2010, Cirrus received approximately 11,388,566 Euros at its bank account at a financial institution located in Dubai ("UAE Bank-1") representing a payment for the first invoice related to the Project.

g.    On or about May 31, 2010, SADR opened bank accounts in the name of Clarity at Swiss Bank-1.

8

h.    On or about July 30, 2010, SADR sent an email to CC-1 stating, in substance and in part:  "Please find attached a copy of Caliry's [sic] USD and EUR accounts in order to shift our deposit routes . . . ."  Attached to that email were documents reflecting Clarity's USD account information at Swiss Bank-1 and listing a U.S.-based bank in New York, New York ("U.S. Bank-1") as the intermediary bank for USD transfers.

i.    On or about October 20, 2010, CC-1 and SADR incorporated Stratus International Contracting Insaat Ve Taahhut Anonim Sirketi ("Stratus Turkey") in Istanbul, Turkey, listing St. Kitts and Nevis as their individual nationality and providing a Dubai personal address.  Under the articles of incorporation, CC-1, SADR, and SADR's sister ("Sister-1") owned 90% of the shares of Stratus Turkey, and another co-conspirator ("CC-2") owned 4% of the shares.

j.    On or about October 28, 2010, SADR opened a bank account in the name of Stratus Turkey at Swiss Bank-1, stating "I shall be the sole signatory on the account for now, till I add my father and sister later on."

k.    On or about December 30, 2010, SADR sent an email to a co-conspirator not named as a defendant herein ("CC-3") stating, "Please find attached the USD account information as requested" and attaching a document listing Stratus Turkey as

9

the "Beneficiary," Swiss Bank-1 as the "Bank of Beneficiary," and U.S. Bank-1, located in New York, New York, as the "Intermediary Bank."

l.    On or about February 2, 2011, SADR sent an email to an employee at Swiss Bank-1 stating, "We are expecting $29m in the coming couple of weeks from Venezuela, so please have your watchful eye on that."

m.    On or about February 11, 2011, CC-3 sent an email to SADR requesting that SADR "[p]lease reconfirm the information of account in USD." Attached to the email was a draft letter in the name of another co-conspirator not named as a defendant herein ("CC-4") on "Iranian Intl. Housing Co." letterhead, with an address in Tehran, Iran, stating in part, "In the view of current difficulties for transfer and movement of funds and to facilitate the process we have decided to appoint a company in Istanbul – Turkey (Stratus International Contracting Insaat ve Taahhut A.S.) to act as our agent and propose to make the payment of IPCs [engineering, procurement, and construction invoices] through this agent." The letter further stated, "For USD:" and listed U.S. Bank-1 in New York, New York, as the correspondent bank, Swiss Bank-1 as the "Bank of Beneficiary," and Stratus Turkey as the "Beneficiary".

10

n.    On or about February 12, 2011, SADR, CC-3, and others caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Stratus Turkey for the benefit of IIHC.  The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for transfer and movements of funds and to facilitate the process we already appointed Stratus International Contracting Insaat ve Taahhut A.S. to act as our agent for receiving the payment of IPCs.  Therefore, we, hereby, request you to order to make the payment of IPCs 7, 8, 9, and 10 to the account of the aforementioned company with the below details."  The letter further stated, "For USD:" and listed U.S. Bank-1 in New York, New York, as the correspondent bank, Swiss Bank-1 as the "Bank of Beneficiary," and Stratus Turkey as the "Beneficiary" with "Purpose of payment: Valuation Number 7 to 10 of Fabricio Ojeda New City, Urban Project."

o.    On or about March 7, 2011, SADR sent an email to CC-4, stating, in substance and in part, that IIHC will be using an abbreviated version of its full business name in Venezuela "so that we can make our transactions a bit easier," and because "we have requested our last invoice to be paid in USD which makes this name change a bit more crucial."  Attached

11

to that email were minutes of an "Extraordinary General Meeting" of the Project Committee, including CC-1, CC-3, and others, during which they discussed, among other things, using the abbreviated name because they were now requesting payments in USD.

        p.   On or about March 26, 2011, SADR sent an email to CC-3 stating, in substance and in part, that CC-3 should inform the "client" that "[t]here's no Iranian behind any accounts" that relate to the Project.

        q.   On or about April 4, 2011, the Subsidiary caused an international wire transfer to Swiss Bank-1 on behalf of Stratus Turkey, in the amount of approximately $29,442,967.57 for IPCs 7, 8, 9, and 10, which was processed by U.S. Bank-1.

        r.   On or about May 9, 2011, CC-2 sent an email to SADR with the subject line "restructuring of Stratus International Turkey," stating, in substance and in part:

> Confirmed that either 5 persons or combination of persons and legal entities with a minimum number 5 required.   Therefore, 1 Austrian company is not sufficient.   4 more persons or legal entities should be added to the new structure.   Since we, none of us want our individual names to be shown in the structure due to the reasons in Venezuela and Iran, we have to find 4 more legal entities or names for the minor shares.

        s.   On or about June 14, 2011, CC-2 sent an email to SADR, copying CC-4, stating in substance and in part,

"Further to our last conversation, I attach the final letter ready for signing and submission. Since it is too late in Tehran . . . I would like to get your agreement to produce [CC-4's] signature." Attached to the email was a draft letter on IIHC letterhead to the Subsidiary, requesting payment for IPCs 11-13.

　　　　t.　On or about July 1, 2011, SADR and CC-2 caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to conduct an international financial transfer to Clarity for the benefit of IIHC. The letter, which was on IIHC letterhead, included the following language: "In the view of the current difficulties for transfer and movements of funds and to facilitate the process we already appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPCs [11, 12, and 13]." The letter provided the following payment instruction details: U.S. Bank-1 in New York, New York, as the "Intermediary Bank," Swiss Bank-1 as the "Beneficiary's Bank," and Clarity as the "Beneficiary".

　　　　u.　On or about July 2, 2011, CC-2 emailed CC-4, copying SADR stating in substance and in part, "Please accept my apologies first of all for being used [sic] your signature for the attached letter," and attached the July 1, 2011 IIHC letter to the Subsidiary requesting payment for IPCs 11, 12, and 13.

13

v.   On or about July 5, 2011, the Subsidiary caused an international wire transfer to Clarity's bank account at Swiss Bank-1, in the amount of approximately $20,692,579.48 for IPCs 11, 12, and 13, which was processed by U.S. Bank-1.

w.   On or about July 6, 2011, SADR sent CC-2 an email stating, in substance and in part, "Please find attached the swift confirmation for the incoming funds from Venezuela for the amount of USD20,692,579.48.  It seems like our strategy has worked so far."

x.   On or about July 22, 2011, SADR, CC-3, and others caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Clarity for the benefit of IIHC.  The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for transfer and movements of funds and to facilitate the process we already appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPC[ 14]."  The letter provided the following payment instruction details: U.S. Bank-1 in New York, New York, as the "Intermediary Bank," Swiss Bank-1 as the "Beneficiary's Bank," and Clarity as the "Beneficiary".

y.   On or about August 11, 2011, the Subsidiary caused an international wire transfer to Clarity's bank account

14

at Swiss Bank-1, in the amount of approximately $5,418,765.49
for IPC 14, which was processed by U.S. Bank-1.

      z.   On or about September 27, 2011, SADR, CC-3,
and others caused a letter to be sent to a representative at the
Subsidiary with instructions for the Subsidiary to engage in an
international financial transfer to Clarity for the benefit of
IIHC.  The letter, which was on IIHC letterhead, included the
following language: "In view of the current difficulties for
transfer and movements of funds and to facilitate the process we
already appointed Clarity Trade & Finance S.A. to act as our
agent for receiving the payment of IPCs [15 and 16]."  The
letter provided the following payment instruction details: U.S.
Bank-1 in New York, New York, as the "Intermediary Bank," Swiss
Bank-1 as the "Beneficiary's Bank," and Clarity as the
"Beneficiary".

      aa.   On or about October 12, 2011, the Subsidiary
caused an international wire transfer to Clarity's bank account
at Swiss Bank-1, in the amount of approximately $5,874,779.37
for IPCs 15 and 16, which was processed by U.S. Bank-1.

      bb.   On or about October 17, 2011, CC-2 sent an
email to a co-conspirator not named as a defendant herein ("CC-
5") stating, in substance and in part, that IIHC will change its
name from Iranian International Housing Company to International

15

Housing Company "[d]ue to developing circumstances." CC-2 forwarded the email to SADR.

cc.    On or about October 24, 2011, SADR, CC-3, and others caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Clarity for the benefit of IIHC. The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for transfer and movements of funds and to facilitate the process we already appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPCs [17 and 18]." The letter provided the following payment instruction details: U.S. Bank-1 in New York, New York, as the "Intermediary Bank," Swiss Bank-1 as the "Beneficiary's Bank," and Clarity as the "Beneficiary".

dd.    On October 24, 2011, SADR sent an email to CC-2, responding to CC-2's email recommending, in substance and in part, to change IIHC's name to either "International Industrial Housing Company" or "International Iron Housing Company," and stating, in substance and in part, "I think the first choice is a good one," but that the order should be "Industrial International Housing Company."

16

ee.   On or about November 9, 2011, the Subsidiary caused an international wire transfer to Clarity's bank account at Swiss Bank-1, in the amount of approximately $12,904,173.50 for IPCs 17 and 18, which was processed by U.S. Bank-1.

ff.   On or about November 12, 2011, SADR, CC-3, and others caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Clarity for the benefit of IIHC.  The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for transfer and movements of funds and to facilitate the process we already appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPC [19]."  The letter provided the following payment instruction details: U.S. Bank-1 in New York, New York, as the "Intermediary Bank," Swiss Bank-1 as the "Beneficiary's Bank," and Clarity as the "Beneficiary.".

gg.   On or about November 28, 2011, SADR, CC-3, and others caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Clarity for the benefit of IIHC.  The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for transfer and movements of funds and to facilitate the process we

17

already appointed Clarity Trade & Finance S.A. to act as our
agent for receiving the payment of IPC [20]."  The letter
provided the following payment instruction details: U.S. Bank-1
in New York, New York, as the "Intermediary Bank," Swiss Bank-1
as the "Beneficiary's Bank," and Clarity as the "Beneficiary".

      hh.  On or about December 27, 2011, the
Subsidiary caused an international wire transfer to Clarity's
bank account at Swiss Bank-1, in the amount of approximately
$4,243,372.66 for IPC 19, which was processed by U.S. Bank-1.

      ii.  On or about December 30, 2011, the
Subsidiary caused an international wire transfer to Clarity's
bank account at Swiss Bank-1, in the amount of approximately
$6,704,753.09 for IPC 20, which was processed by U.S. Bank-1.

      jj.  On or about January 5, 2012, an assistant to
SADR and CC-2 sent CC-2 an email, copying SADR, and attaching
new payment routing instructions for future USD payment to
Clarity's account at Swiss Bank-1.  The instructions listed
another financial institution based in Switzerland ("Swiss Bank-
3") as the new "Intermediary Bank" for USD payments.

      kk.  On or about January 26, 2012, SADR, CC-2,
and CC-3 caused a letter to be sent to a representative at the
Subsidiary with instructions for the Subsidiary to engage in an
international financial transfer to Clarity for the benefit of

18

IIHC. The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for transfer and movements of funds and to facilitate the process we already appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPC [21]." The letter provided the following payment instruction details: Swiss Bank-3 as the "Intermediary Bank," Swiss Bank-1 as the "Beneficiary's Bank," and Clarity as the "Beneficiary."

ll.  On or about February 23, 2012, the Subsidiary caused an international wire transfer to Clarity's bank account at Swiss Bank-1, in the amount of approximately $7,389,475.00 for IPC 21, which was processed by another U.S.-based bank ("U.S. Bank-2"), in New York, New York.

mm.  On or about April 13, 2012, the Subsidiary caused an international wire transfer to Clarity's bank account at Swiss Bank-1, in the amount of approximately $15,776,884.74, which was processed by U.S. Bank-2 in New York, New York.

nn.  On or about May 30, 2012, SADR and CC-3 caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Clarity for the benefit of IIHC. The letter, which was on IIHC letterhead, included the following language: "In view of the current difficulties for

19

transfer and movements of funds and to facilitate the process we already appointed Clarity Trade & Finance S.A. to act as our agent for receiving the payment of IPCs [23 and 24]."  The letter provided the following payment instruction details: U.S. Bank-2 as the "Intermediary Bank," Swiss Bank-1 as the "Beneficiary's Bank," and Clarity as the "Beneficiary".

        oo.  In or about August 2012, CC-3 visited an official representative of the Iranian government in Caracas, Venezuela ("Iranian Government Official-1") and asked, in substance and in part, for diplomatic intervention regarding payments owed to IIHC pursuant to the Project.

        pp.  On or about August 31, 2012, SADR, CC-3, and others caused a letter to be sent to a representative at the Subsidiary with instructions for the Subsidiary to engage in an international financial transfer to Clarity for the benefit of IIHC.  The letter, which was on IIHC letterhead, included the following language: "Referring to our meeting held in the Miranda Building date on 30.08.2012 we hereby according to the minutes of the said meeting request you to order to make the payment for IPC 23 & 24 to the following accounts with the below details, in USD currency and in BsF [Venezuelan Bolivars]."  The letter provided the following payment instruction details for USD payment: U.S. Bank-2 as the "Intermediary Bank," Swiss Bank-

1 as the "Beneficiary's Bank," and Stratus Turkey as the
"Beneficiary." For Bolivar payments, the letter listed IIHC as
the beneficiary with an account at a financial institution in
Venezuela ("Venezuela Bank-1").

　　　　qq. On or about September 21, 2012, the
Subsidiary caused an international wire transfer to a Stratus
Turkey bank account at Swiss Bank-1, in the amount of
approximately $1,894,333.40 for IPCs 23, 24, and 25, which was
processed by U.S. Bank-2.

　　　　rr. On or about September 27, 2012, a co-
conspirator not named as a defendant herein ("CC-6") sent an
email to CC-2, copying SADR, stating, in substance and in part,
"we received USD 1,894,333.40 into our Stratus Intl. account
from Venezuela."

　　　　ss. On or about October 15, 2012, SADR and CC-3
caused a letter to be sent to a representative at the Subsidiary
with instructions for the Subsidiary to engage in an
international financial transfer to Stratus Turkey for the
benefit of IIHC. The letter, which was on IIHC letterhead,
requested payment in both USD and Bolivars for IPCs 26, 27, 28,
and 29, and provided the following payment instruction details
for USD payment: U.S. Bank-2 as the "Intermediary Bank," Swiss
Bank-1 as the "Beneficiary's Bank," and Stratus Turkey as the

"Beneficiary." For Bolivar payments, the letter listed IIHC as the beneficiary with an account at Venezuelan Bank-1.

tt. On or about November 14, 2012, the Subsidiary caused an international wire transfer to Stratus Turkey's bank account at Swiss Bank-1, in the amount of approximately $1,238,741.38 for IPC 26, which was processed by U.S. Bank-2.

uu. On or about November 15, 2012, the Subsidiary caused international wire transfers to Stratus Turkey's bank account at Swiss Bank-1, in the amount of approximately $71,505, which was processed by U.S. Bank-2.

vv. On or about November 15, 2012, the Subsidiary caused an international wire transfer to Stratus Turkey's bank account at Swiss Bank-1, in the amount of approximately $628,470.60, which was processed by U.S. Bank-2.

ww. On or about December 9, 2012, an individual who was then a high-ranking official at the Stratus Group ("CC-7"), sent a letter to Iranian Government Official-1 requesting, in substance and in part, that Iranian Government Official-1 apply political pressure to the Subsidiary to adhere to the terms of the contract with IIHC.

xx. On or about February 7, 2013, the Subsidiary caused an international wire transfer to Stratus Turkey's bank

22

account at Swiss Bank-1, in the amount of approximately
$87,141.67, which was processed by U.S. Bank-2.

yy.  On or about August 27, 2013, SADR and CC-2
caused a letter to be sent to a representative at the Subsidiary
with instructions for the Subsidiary to engage in an
international financial transfer to Stratus Turkey for the
benefit of IIHC.  The letter, which was on IIHC letterhead,
requested payment in both USD and Bolivars for IPCs 31 through
37, and provided the following payment instruction details for
USD payment: U.S. Bank-2 as the "Intermediary Bank," Swiss Bank-
1 as the "Beneficiary's Bank," and Stratus Turkey as the
"Beneficiary."  For Bolivar payments, the letter listed IIHC as
the beneficiary with an account at Venezuelan Bank-1.

zz.  On or about November 21, 2013, the
Subsidiary caused an international wire transfer to Stratus
Turkey's bank account at Swiss Bank-1, in the amount of
approximately $3,140,583.45 for IPCs 31 through 37, which was
processed by U.S. Bank-2.

aaa. On or about March 2, 2014, the Project
Committee held a meeting, which was attended by SADR, CC-2, and
CC-3, among others.  During the meeting, the Project Committee,
among other things, directed the "Project Management," in
substance and in part, to follow up with the Subsidiary to

23

receive "accumulated monies" for completed activities, which was estimated to be approximately $10 million USD.

       bbb. On or about May 29, 2014, IIHC hosted a Project meeting attended by representatives of IIHC, representatives of the Subsidiary, and Iranian Government Official-1, among others, at which participants discussed IIHC's demands for payment in USD.

       (Title 18, United States Code, Section 371).

### COUNT TWO

(Conspiracy to Violate the
International Emergency Economic Powers Act)

The Grand Jury further charges:

      17. The allegations contained in paragraphs 1 through 13 and 16 of this Indictment are repeated and realleged as if fully set forth herein.

      18. From at least in or about 2006, up to and including at least in or about May 2014, in the Southern District of New York, Turkey, Switzerland, Iran, and elsewhere, ALI SADR HASHEMI NEJAD, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic

Powers Act, Title 50, United States Code, Sections 1701 to 1707,
Part 560 of Title 31, Code of Federal Regulations, and Part 561
of Title 31, Code of Federal Regulations.

19.  It was a part and an object of the conspiracy
that ALI SADR HASHEMI NEJAD, the defendant, and others known and
unknown, would and did export, reexport, sell, and supply, and
cause to be exported, reexported, sold, and supplied, directly
and indirectly, from the United States, services, to wit,
international financial transactions, to Iran and to the
Government of Iran, without first obtaining the required
approval of OFAC, in violation of Title 50, United States Code,
Sections 1701 to 1707, and Title 31, Code of Federal
Regulations, Section 560.204.

20.  It was further a part and an object of the
conspiracy that ALI SADR HASHEMI NEJAD, the defendant, and
others known and unknown, would and did engage in a transaction
that evaded and avoided, had the purpose of evading and
avoiding, caused a violation of, and attempted to violate one or
more of the prohibitions set forth in Title 31, Code of Federal
Regulations, Part 560, in violation of Title 50, United States
Code, Sections 1701 to 1707, and Title 31, Code of Federal
Regulations, Section 560.203.

## Overt Acts

21.  In furtherance of the conspiracy and to effect the illegal objects thereof, ALI SADR HASHEMI NEJAD, the defendant, and others committed the overt acts set forth in paragraph 16 of this Indictment, which are fully incorporated by reference herein, among others.

(Title 50, United States Code, Section 1705;
Title 31, Code of Federal Regulations, Sections 560.203,
560.204, & 560.205.)

## COUNT THREE

### (Bank Fraud)

The Grand Jury further charges:

22.  The allegations contained in paragraphs 1 through 13 and 16 of this Indictment are repeated and realleged as if fully set forth herein.

23.  From at least in or about 2006, up to and including at least in or about May 2014, in the Southern District of New York, Turkey, Switzerland, Iran, and elsewhere, ALI SADR HASHEMI NEJAD, the defendant, and others known and unknown, did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the

26

custody and control of such financial institution, by means of false and fraudulent pretenses, representations, and promises, and aided and abetted the same, to wit, inducing U.S. financial institutions to conduct financial transactions on behalf of and for the benefit of the Government of Iran and Iranian entities and persons using money and property owned by and under the custody and control of such financial institutions, by deceptive means.

(Title 18, United States Code, Sections 1344 & 2.)

## COUNT FOUR

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

24.  The allegations contained in paragraphs 1 through 13 and 16 of this Indictment are repeated and realleged as if fully set forth herein.

25.  From at least in or about 2006, up to and including at least in or about May 2014, in the Southern District of New York, Turkey, Switzerland, Iran, and elsewhere, ALI SADR HASHEMI NEJAD, the defendant, and others known and unknown, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

27

26.   It was a part and an object of the conspiracy that ALI SADR HASHEMI NEJAD, the defendant, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the FDIC, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

### Overt Acts

27.   In furtherance of the conspiracy and to effect the illegal object thereof, ALI SADR HASHEMI NEJAD, the defendant, and others committed the overt acts set forth in paragraph 16 of this Indictment, which are fully incorporated by reference herein, among others.

(Title 18, United States Code, Section 1349.)

### COUNT FIVE

### (Money Laundering)

The Grand Jury further charges:

28.   The allegations contained in paragraphs 1 through 13 and 16 of this Indictment are repeated and realleged as if fully set forth herein.

28

29.   From at least in or about 2006, up to and including at least in or about May 2014, in the Southern District of New York, Turkey, Switzerland, Iran, and elsewhere, ALI SADR HASHEMI NEJAD, the defendant, and others known and unknown, together with others known and unknown, in an offense involving and affecting interstate and foreign commerce, did knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, and aided and abetted the same, with the intent to promote the carrying on of specified unlawful activity, to wit, (i) the illegal export of services to Iran as charged in Count Two of this Indictment, and (ii) bank fraud as charged in Counts Three and Four of this Indictment.

(Title 18, United States Code, Sections 1956(a)(2)(A) & 2.)

## COUNT SIX

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

30.   The allegations contained in paragraphs 1 through 13 and 16 of this Indictment are repeated and realleged as if fully set forth herein.

31.    From at least in or about 2006, up to and
including at least in or about May 2014, in the Southern
District of New York, Turkey, Switzerland, Iran, and elsewhere,
ALI SADR HASHEMI NEJAD, the defendant, and others known and
unknown, together with others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to violate Title 18, United States Code,
Section 1956(a)(2)(A).

32.    It was a part and an object of the conspiracy
that ALI SADR HASHEMI NEJAD, the defendant, and others known and
unknown, in an offense involving and affecting interstate and
foreign commerce, would and did transport, transmit, and
transfer, and attempt to transport, transmit, and transfer,
monetary instruments and funds to places in the United States
from and through places outside the United States, in amounts
exceeding $10,000, with the intent to promote the carrying on of
specified unlawful activity, to wit, the illegal export of
services to Iran as charged in Count Two of this Indictment and
bank fraud as charged in Counts Three and Four of this
Indictment, in violation of Section 1956(a)(2)(A) of Title 18,
United States Code.

## Overt Acts

33.    In furtherance of the conspiracy and to effect
the illegal object thereof, ALI SADR HASHEMI NEJAD, the
defendant, and others committed the overt acts set forth in
paragraph 16 of this Indictment, which are fully incorporated by
reference herein, among others.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

### (Counts Two and Three)

34.    As a result of committing the offenses alleged in
Counts Two and Three of this Indictment, ALI SADR HASHEMI NEJAD,
the defendant, shall forfeit to the United States, pursuant to
Title 18, United States Code, Section 982(a)(2)(A), any and all
property constituting or derived from, proceeds obtained
directly or indirectly, as a result of the commission of said
offenses, including but not limited to (i) a sum of money in
United States currency representing the amount of proceeds
traceable to the commission of said offense that the defendant
personally obtained and (ii) all right, title and interest of
the defendant in the following specific property: (a) Fresno,
California accessor parcel numbers ("APN") 050-040-15s, 050-040-
16s, 050-040-17s, 050-190-07s, and 050-220-28s; and (b) 27314
Winding Way, Malibu, CA 90265.

31

## FORFEITURE ALLEGATIONS

### (Counts Five and Six)

35. As a result of committing the money laundering offenses alleged in Counts Five and Six of this Indictment, ALI SADR HASHEMI NEJAD, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to; (i) a sum of money representing the amount of property that was involved in the money laundering offense or is traceable to such property and (ii) all right, title and interest of the defendant in the following specific property: (a) Fresno, California APN 050-040-15s, 050-040-16s, 050-040-17s, 050-190-07s, and 050-220-28s; and (b) 27314 Winding Way, Malibu, CA 90265.

### Substitute Assets Provision

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a) cannot be located upon the exercise of due diligence;

    b) has been transferred or sold to, or deposited with, a third person;

    c) has been placed beyond the jurisdiction of the court;

d)   has been substantially diminished in value;
     or

e)   has been commingled with other property
     which cannot be subdivided without
     difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the above

forfeitable property.

(Title 18, United States Code, Sections 981, 982;
    Title 21, United States Code, Section 853;
    Title 28, United States Code, Section 2461.)

_____
Foreperson

_____
GEOFFREY S. BERMAN
United States Attorney

33

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ALI SADR HASHEMI NEJAD,

Defendant.

SEALED INDICTMENT

18 Cr. ___

(18 U.S.C. § 371; 50 U.S.C. § 1705; 31
C.F.R. §§ 560.203, 560.205; 18 U.S.C.
§§ 1349, & 1956.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

_____
                        Foreperson.